24CA0376 Peo in Interest of AR-B 09-12-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA0376
Mesa County District Court No. 22JV131
Honorable Valerie J. Robison, Judge

The People of the State of Colorado,

Appellee,

In the Interest of A.S.R-B. and E.L.R-B., Children,

and Concerning B.R.F.,

Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE LIPINSKY
J. Jones and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 12, 2024

Todd M. Starr, County Attorney, Brad Junge, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Josie Burt, Guardian Ad Litem

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1     B.R.F. (mother) appeals the judgment terminating her parent-child legal relationships with A.S.R-B. and E.L.R-B. (the children). We affirm.

## I.     Background

¶ 2     In November 2022, the Mesa County Department of Human Services filed a petition in dependency or neglect concerning the children, who were three and seven years old at the time. The Department was concerned that the children lacked supervision, that their conditions were unsafe, and that the parents were abusing substances. The juvenile court granted temporary legal custody to the Department, and the children were placed with kin.

¶ 3     The juvenile court adjudicated the children dependent or neglected. The court subsequently adopted a treatment plan that required mother to complete a capacity to parent evaluation; address substance abuse, mental health, and domestic violence issues; attend supervised family time and take parenting classes; participate in life skills training; maintain a safe and stable household; and cooperate with the Department. The Department later moved to terminate mother's parental rights. Following a hearing in January 2024, the juvenile court granted the motion.

1

## II.    Reasonable Efforts

¶ 4    Mother contends that the juvenile court erred by finding that the Department made reasonable efforts to rehabilitate her and reunite the family.  She argues that the caseworker's service authorizations were inadequate because the caseworker did not have the expertise to determine whether the agencies she authorized were qualified to assist mother.  Mother also argues that she was unable to engage in the services because the Department failed to provide her with transportation and a cell phone.  We discern no error.

### A.    Standard of Review and Preservation

¶ 5    Whether the Department satisfied its obligation to make reasonable efforts is a mixed question of fact and law.  *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8, 527 P.3d 404, 407. Therefore, we review the juvenile court's factual findings for clear error but review de novo its legal determination that the Department made reasonable efforts to rehabilitate the parent.  *Id.*

¶ 6    The Department and guardian ad litem (GAL) dispute preservation and argue that mother failed to challenge the reasonableness of the Department's efforts before the termination

2

hearing.  *See People in Interest of D.P.*, 160 P.3d 351, 355-56 (Colo. App. 2007) (declining to review a reasonable efforts finding because the parent failed to object to services provided before the termination hearing).  *But see People in Interest of S.N-V.*, 300 P.3d 911, 916 (Colo. App. 2011) (holding that a parent's failure to object to services does not bar appellate review of a reasonable efforts findings).  We need not resolve this dispute because, even assuming the issue is preserved, we discern no basis for reversal.

## B.     Applicable Law

¶ 7     The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent or neglected; (2) the parent has not complied with an appropriate, court-approved treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 8     To determine whether a parent is unfit, the juvenile court must consider whether the department of human services made reasonable efforts to rehabilitate the parent and reunite the family. *See* §§ 19-3-100.5(1), 19-3-604(2)(h), C.R.S. 2024; *S.N-V.*, 300 P.3d

at 915.  "Reasonable efforts" means the "exercise of diligence and care" for children who are in out-of-home placement. § 19-1-103(114), C.R.S. 2024.  Services provided in accordance with section 19-3-208, C.R.S. 2024, satisfy the reasonable efforts standard.  § 19-1-103(114).

¶ 9    Under section 19-3-208, a department of social services must provide screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time services; and placement services. § 19-3-208(2)(b).  If funding is available, section 19-3-208 requires the department to provide services such as transportation, diagnostic and mental health services, and drug and alcohol services.  § 19-3-208(2)(d).  However, services must be provided only if they are determined to be necessary and appropriate based on the individual case plan.  § 19-3-208(2)(b), (d).

¶ 10    The parent is responsible for using such services to obtain the assistance the parent needs to comply with her treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). When a parent voluntarily absents herself from a proceeding and

cannot be located, the department of social services need not persist with futile efforts. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12, 297 P.3d 1019, 1022. Moreover, a juvenile court may consider a parent's unwillingness to participate in treatment as a factor in determining whether the department made reasonable efforts. *See id.*

## C. Analysis

¶ 11 The juvenile court determined that the Department made reasonable efforts to rehabilitate mother by authorizing the services required by statute and trying to assist with her treatment plan. The court found the Department could not authorize services for "quite some time" because mother had not signed the required release of information, but ultimately, the Department authorized supervised family time, a capacity to parent assessment, a co-occurring substance abuse and mental health assessment, a domestic violence evaluation, and sobriety monitoring. The court found that the caseworker provided mother with bus passes and gas coupons. The court also noted that, because mother "distrust[ed] . . . the Department," the caseworker "went out of [her] way" to meet with mother at neutral locations and used different

methods of communication, such as phone and email, to try to contact mother. Even so, the court found that mother did not avail herself of any of the services provided by the Department or comply with any of the requirements of her treatment plan. The record supports these findings.

¶ 12 The caseworker testified that it was "hard to get [mother] to sign any releases of information." The caseworker's reports, which were admitted as evidence during the termination hearing, indicated that the caseworker met with mother and asked her to sign the releases shortly after the treatment plan was adopted, but mother did not sign the releases for about two months. Nonetheless, when mother signed the releases, the caseworker authorized numerous services, including those listed by the juvenile court and required by section 19-3-208(2)(b). The caseworker emailed mother to notify her about the services, and the providers also reached out to mother to schedule initial appointments. But by the time of the termination hearing, mother had not completed any of the evaluations or engaged in any of the authorized services except for family time.

¶ 13    Although mother implies that the service authorizations were inadequate because the caseworker admitted she did not know each service provider's qualifications, mother does not point us to any authority requiring a caseworker to know a provider's qualifications before offering the provider's services to a parent.  Rather, the caseworker testified that the Department has a list of authorized providers that includes the services they offer.  The caseworker found all of the providers and services she authorized for mother on that list.

¶ 14    Next, contrary to mother's argument, the record indicates that the Department tried to provide her with transportation assistance. The caseworker testified that, when mother reported that transportation was a problem, the caseworker provided mother with a bus pass.  Then, when mother told the caseworker that the bus pass was not helpful, she authorized a gas card to give to mother when they met.  The caseworker testified that she authorized several gas cards throughout the case, but mother repeatedly failed to pick them up.

¶ 15    We reject mother's argument that the Department's efforts were unreasonable because it did not provide her with a phone.

The caseworker testified that, throughout the case, mother gave her several different phone numbers. The caseworker said she was able to send messages to, and leave voicemails for, mother using those numbers and that mother would respond — infrequently — via text or a call. Although the caseworker talked to mother about her lack of communication, mother did not say she needed a phone or help getting reliable phone service. And during her testimony, mother never said that the lack of a reliable phone or service was a barrier to contacting the caseworker. *See* § 19-3-208(2)(b), (d) (providing that services must only be provided if they are determined to be "necessary and appropriate").

¶ 16    We also reject mother's argument that the caseworker failed to make efforts to communicate with mother. As mother points out, the caseworker admittedly only emailed mother once, and when that email was undeliverable, the caseworker did not try to email mother again. But the caseworker testified, and her reports indicate, that throughout the case, mother's communication with the caseworker was inconsistent. The caseworker testified that there were "months where [she was] not able to locate [mother] . . . or communicate with her at all." Even so, the record shows that

8

the caseworker consistently attempted to communicate with mother in other ways — she scheduled numerous in-person meetings at neutral locations, called and texted, sent messages through Facebook, sent letters, and went to the visitation center to try to talk to mother after her family time sessions.

¶ 17      In sum, the record supports the juvenile court's determination that the Department's efforts were reasonable, particularly when viewed in conjunction with mother's failure to communicate with the caseworker or engage in the services that the Department offered to her. *See A.V.*, ¶ 12, 297 P.3d at 1022. Accordingly, we discern no error in the juvenile court's reasonable efforts determination.

III.    Less Drastic Alternatives

¶ 18      Mother contends that the juvenile court erred by finding that there were no less drastic alternatives to termination of her rights. She argues that the kin placement's testimony, which indicated a lack of understanding about an allocation of parental responsibilities (APR) or a guardianship, showed that the Department did not properly explore less drastic alternatives. We disagree.

9

## A. Standard of Review and Preservation

¶ 19    "We review a juvenile court's less drastic alternatives findings for clear error." *People in Interest of E.W.*, 2022 COA 12, ¶ 34, 508 P.3d 256, 262. Accordingly, when a juvenile court considers a less drastic alternative but instead finds that termination is in the child's best interests, we must affirm the court's decision so long as the record supports its findings. *People in Interest of B.H.*, 2021 CO 39, ¶ 80, 488 P.3d 1026, 1042.

¶ 20    The Department and GAL dispute preservation and argue that mother failed to raise her less drastic alternatives argument before termination or argue it at the hearing. *See Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 25, 543 P.3d 409, 415 (holding that, to properly preserve an argument for appeal, the party asserting it must present the "sum and substance of the argument" to the trial court) (quoting *Madalena v. Zurich Am. Ins. Co.,* 2023 COA 32, ¶ 50, 532 P.3d 776, 788). Again, we need not resolve this dispute because, even assuming the issue is preserved, we discern no basis for reversal.

## B. Applicable Law

¶ 21 A juvenile court's consideration and elimination of less drastic alternatives is implicit in the statutory criteria for termination. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40, 480 P.3d 682, 690. In considering less drastic alternatives, a juvenile court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29, 463 P.3d 330, 335.

¶ 22 For a less drastic alternative to be viable, it must do more than adequately meet a child's needs; rather, the less drastic alternative must be in the child's best interests. *A.M.*, ¶ 27, 480 P.3d at 688. Long-term or permanent placement with a family member or foster family, short of termination, may not be a viable less drastic alternative if it does not provide adequate permanence that adoption would provide or otherwise meet a child's needs. *People in Interest of A.R.*, 2012 COA 195M, ¶ 41, 310 P.3d 1007, 1017. If a juvenile court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *A.M.*, ¶ 32, 480 P.3d at 689.

## C. Analysis

¶ 23 The juvenile court "considered providing additional time to complete the treatment plan, ordering an [APR], or ordering a guardianship" but concluded that none of those less drastic alternatives would be in the children's best interests. The court found that, throughout the case, mother had been inconsistent with attending family time, which would "throw the [children] off" and that "various concerns" were expressed about mother's "ability to care for and meet the needs of the children." The court found that the children "need[ed] a permanent stable home that can be assured only through adoption." The court concluded that "the benefit of termination outweigh[ed] the detriment" and was in the children's best interests. The record supports these findings.

¶ 24 The caseworker opined that allowing more time for mother to work on the treatment plan was not a viable less drastic alternative because mother had not engaged in any services other than family time, and that such engagement was inconsistent. In addition, she opined that an APR was not in the children's best interests because it would create the potential for future contact with mother. This was a concern because mother had not been "appropriate with

12

visits" or "provided what the [children] need[ed] during those times." According to the caseworker, at the time of the hearing, mother was unable to provide for the children's basic needs and her ability to meet their needs was "exactly where it was" when the Department opened the case, which was "not safe for the [children] at all." *See A.R.*, ¶ 38, 310 P.3d at 1016 (stating that, in determining whether a less drastic alternative is viable, "[a] court . . . may consider whether an ongoing relationship with the parent would be beneficial" to the child, which is "influenced by a parent's fitness to care for [the] child's needs").

¶ 25    The caseworker also testified that the children needed "consistent[,] . . . stable, and predictive" caregivers. Specifically, she said that the older child needed permanency because he was becoming more anxious as time passed and asking "questions that [the caseworker couldn't] answer." Further, the caseworker opined that permanency was important for the younger child based on his age and because "it could predict a lot of things in the future." *See* § 19-1-102(1.6), C.R.S. 2024 ("[S]tudies . . . disclose that a child who has not bonded with a primary adult during [the] critical stage [before six years of age] will suffer significant emotional damage

13

which frequently leads to chronic psychological problems and antisocial behavior when the child reaches adolescence and adulthood."). She testified that termination would provide the permanency the children needed.

¶ 26 We recognize that the kin placement did not seem to fully understand how an APR or guardianship would work. But while the juvenile court could have properly considered the placement's preference for adoption over other permanency options, *see Z.M.*, ¶ 31, 463 P.3d at 335, its rejection of less drastic alternatives was not based on the placement's preference for adoption. Instead, the court based its decision on the children's best interests, as it was required to do. *See A.M.*, ¶¶ 27, 32, 480 P.3d at 688-89. Because the record supports the court's finding that less drastic alternatives were not in the children's best interests, we must affirm the decision. *See B.H.*, ¶ 80, 488 P.3d at 1042.

IV. Disposition

¶ 27 The judgment is affirmed.

JUDGE J. JONES and JUDGE SULLIVAN concur.